IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROSELY ALTAGRACIA STOKES,      :
                                :
              Plaintiff,         :
                                :   Civ. A. No. 13-1479-RGA/MPT
      v.                         :
                                :
CAROLYN W. COLVIN,               :
Acting Commissioner of           :
Social Security,                 :
                                :
              Defendant.         :

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On August 26, 2013, plaintiff Rosely Altagracia Stokes ("plaintiff") filed this action

against Carolyn W. Colvin, Acting Commissioner of Social Security ("defendant").

Plaintiff appeals defendant's decision denying her application for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the

Social Security Act.  Presently before the court are the parties' cross-motions for

summary judgment.  For the reasons set forth below, the court recommends plaintiff's

motion for summary judgment be denied, and defendant's cross-motion for summary

judgment be granted.

## II.   BACKGROUND

### A.    Procedural History

On November 9, 2009, plaintiff applied for DIB, and on November 27, 2009 she

applied for SSI.[1]  In both applications, plaintiff alleged she was disabled starting on

---

[1] D.I. 12 at 536-547.

January 9, 2009, due to a heart condition, back problems, and numbness in her arm

and back.[2]  Plaintiff's applications were initially denied on May 19, 2010[3] and on

reconsideration on September 28, 2010.[4]  On November 10, 2010, plaintiff filed a

written request for a hearing.[5]

　　　A hearing before Administrative Law Judge ("ALJ") Melvin D. Benitz was

conducted on August 30, 2011.[6]  Plaintiff, represented by Tricia A. O'Donnell, a non-

attorney representative, testified at the hearing.[7]  Christina Cody, an impartial vocational

expert ("VE"), also appeared at the hearing.[8]  On October 19, 2011, the ALJ issued a

written decision denying plaintiff's applications for DIB and SSI.[9]  The ALJ noted

plaintiff's insured status expired on December 31, 2013, and therefore, she was

required to establish disability on or before that date in order to be entitled to a period of

disability and DIB.[10]  The ALJ held plaintiff was not disabled under sections 216(i),

223(d), and 1614(a)(3)(A) of the Social Security Act.[11]  Specifically, the ALJ found

plaintiff had severe impairments, including depression, post-traumatic stress disorder,

degenerative disc disease, chronic obstructive pulmonary disease, and coronary artery

disease (aortic thoracoabdominal aneurysm), but nonetheless had the residual

functional capacity to perform simple unskilled light work as defined in 20 C.F.R. §

---

[2] *Id.* at 562.
[3] *Id.* at 460-61.
[4] *Id.* at 478-79.
[5] *Id.* at 495-96.
[6] D.I. 11 at 398-439.
[7] *Id.* at 401-28.
[8] *Id.* at 428-39.
[9] *Id.* at 18-29.
[10] *Id.* at 18.
[11] *Id.*

404.1567(b) and § 416.967(b).[12]  The ALJ further determined although plaintiff could perform said work, she can sit for 20-30 minutes, stand for 20-30 minutes on an alternate basis during an eight hour workday with ordinary and customary breaks,[13] and avoid heights, dangerous machinery, climbing stairs, ropes, ladders, and odors, gases, fumes, and dust.[14]  He also found she could only have occasional interactions with her supervisor, the public and co-workers.[15]  The ALJ found plaintiff mildly limited in pushing and pulling with her lower left extremity.[16]

Plaintiff's subsequent appeal to the Appeals Council was denied, as the Council concluded there was no basis for reviewing the ALJ's decision.[17]  The ALJ's decision, therefore, constitutes the final decision of the Commissioner.[18]

Having exhausted all administrative remedies, plaintiff now seeks judicial review of this decision under 42 U.S.C. § 405(g).[19]  On January 16, 2014, plaintiff moved for summary judgment.[20] On February 18, 2014, defendant filed a cross-motion for summary judgment.[21]

B.  **Factual Background**

Plaintiff was 45 years old at her onset date, and is considered a "younger person"

---

[12] *Id.* at 21-23; *see also* 20 C.F.R. § 404.1567(b); 20 C.F.R. § 415.967(b).
[13] D.I. 11 at 23.
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.* at 36-37.
[18] *Id.* at 1-4.
[19] D.I. 1; *see also* 42 U.S.C. § 405(g).
[20] D.I. 13.
[21] D.I. 16.

at all times relevant to her DIB and SSI applications.[22]  She has a ninth-grade

education.[23]  Her prior vocational experience included hand packager, machine

operator, assembler, warehouse worker, and housekeeper.[24]

### 1.    Medical Evidence

Prior to the alleged onset date, plaintiff underwent open heart surgery for a

thoracic aortic aneurysm with dissection, followed by intensive care for one month.[25]  On

September 30, 2008, Madhavi Y. Yerneni, M.D. ("Dr. Yerneni"), a specialist in internal

medicine, noted plaintiff had emphysema ("COPD"), which had been stable since

2006.[26]  On March 31, 2008, Dr. Yerneni diagnosed plaintiff suffered from depression,

spondylosis/osteoarthritis of the spine, chest pain and had returned to smoking.[27]  On

April 9, 2008, plaintiff reported thoracic back pain at a follow-up visit with Derreck

Robinson, P.A. ("Robinson"), describing the pain as "needle-like" and worse when

working.[28]  Robinson  found tenderness on palpation of the thoracic spine regions,

prescribed Tramadol, and advised to alternate positions at work.[29]

On July 31, 2008, she returned to Dr. Yerneni complaining of significant left knee

pain.[30]  Dr. Yerneni noted tenderness of the left knee, diagnosed bursitis and

---

[22] D.I. 11 at 424; *see also* 20 C.F.R. § 404.1563(c) ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.").
[23] D.I. 11 at 422.
[24] *Id.* at 27.
[25] D.I. 12 at 622.
[26] *Id.* at 683.
[27] *Id.* at 622.
[28] *Id.* at
[29] *Id.* at 625-26.
[30] *Id.* at 627-28.

administered a Steagall injection.[31]  Plaintiff returned to Dr. Yerneni on August 28, 2008,

because of severe abdominal pain after being diagnosed with diverticulitis at Rhode

Island Hospital a week prior.[32]  Dr. Yerneni noted continued abdominal pain, which had

improved.[33]  On September 19, 2008, plaintiff visited Dr. Yerneni reporting persistent

burning and tingling thoracic pain, which was progressive and prevented standing or

working.[34]  Dr. Yerneni diagnosed thoracic pain with paresthesias and a suspected

herniated disk.[35]  Within six days, plaintiff was evaluated at the Rhode Island Hospital

emergency room for shortness of breath and chest pain, radiating to her back.[36]  She

described the pain at seven on a scale of one to ten.[37]  Thereafter, she was monitored

and treated for several hours and released that night after the pain subsided.[38]  A

thoracic spine MRI revealed degenerative changes at the L4-L5 level.[39]

On February 4, 2009, plaintiff reported her back pain improved because she was

no longer working.[40]  On August 11, 2009, plaintiff saw Dr. Yerneni, and advised she

was doing well without chest pain or shortness of breath, but experienced episodes of

vertigo.[41]  Dr. Yerneni recommended an evaluation by an ear, nose, and throat

specialist.[42]

On November 4, 2009, plaintiff was seen by Irene Szeto, M.D. ("Dr. Szeto") at

---

[31] *Id.*
[32] *Id.* at 630.
[33] *Id.*
[34] *Id.* at 632-33.
[35] *Id.*
[36] *Id.* at 608-09.
[37] *Id.*
[38] *Id.*
[39] *Id.* at 635.
[40] *Id.* at 640-42.
[41] *Id.* at 679.
[42] *Id.*

Christiana Care Health Services ("Christiana"), for recurrent leg pain and dizziness.  Dr. Szeto diagnosed hyperlipidemia and hypertension, prescribed Benazepril,[43] and referred plaintiff to Bhaskar Rao, M.D. ("Dr. Rao") for further evaluation of her vascular condition.[44]  On November 25, 2009, Dr. Rao reported plaintiff had lower left extremity pain and discomfort not associated with ambulation, which increased when walking long distances, and ordered a CT angiography.[45]  The CT angiography revealed a chronic type A aortic dissection, and he referred her to the Christiana emergency room for immediate evaluation by cardiac surgeons on December 16, 2009.[46]  The Christiana surgeons found plaintiff's condition was stable, and did not require any acute surgical intervention.[47]

Plaintiff was evaluated by John Kelly III, M.D. ("Dr. Kelly"), a cardiologist, who noted chest discomfort, worsened by emotional stress, and prescribed a beta blocker.[48] Dr. Kelly found no evidence of cardiac injury based on enzyme testing and an electrocardiogram, but recommended close follow up regarding her chronic thoracoabdominal aortic dissection.[49]

On December 23, 2009, plaintiff was evaluated by an emergency room cardiac surgeon, who felt plaintiff's ascending aortic dissection was chronic in nature and could be managed medically with antihyperintensive agents.[50]  The same day, she saw Dr.

---

[43] *Id.* at 724-25.
[44] *See id.* at 837-38.
[45] *Id.* at 837-38.
[46] *Id.* at 835.
[47] *Id.* at 704.
[48] *Id.* at 704-05.
[49] *Id.*
[50] *Id.* at 835.

Rao, who performed an exercise treadmill study, which revealed plaintiff was only able to ambulate for five minutes due to bilateral lower extremity pain.[51]  The study suggested the nature of her complaints of lower extremity pain were not arterial, but possibly neuromuscular.[52]  On January 22, 2010, plaintiff underwent a chest CTA which revealed an extensive post surgical repair of the ascending aortic dissection to the abdominal aortic bifurcation.[53]

Plaintiff returned to Dr. Szeto for follow-up on February 23, 2010, reporting numbness and tingling in both hands at night and numbness and discomfort in her legs.[54]  Dr. Szeto's examination found her blood pressure was under "excellent control,"[55] lungs clear to auscultation with non-labored respirations, normal heart rate and rhythm with no murmur, and normal gait, range of motion, and strength.[56]  Dr. Szeto continued the ACE-inhibitor for hypertension, determined plaintiff was currently disabled from work, and diagnosed "anti-dissection, carpal tunnel, restless legs, COPD, and hypertension."[57]

On March 16, 2010, spirometry studies revealed no definite obstructive or restrictive ventilatory deficits, normal lung capacity, with mild reduction in vital capacity and moderate reduction in diffusion capacity.[58]  Plaintiff saw Dr. Szeto on April 6, 2010, and the findings reflected no focal neurologic deficits, normal gait, sensation, motor

---

[51] *Id.* at 726.
[52] *Id.*
[53] *Id.* at 841-44.
[54] *See id.* at 713.
[55] *Id.*
[56] *Id.* at 713-15.
[57] *Id.*
[58] *Id.* at 734, 739.

function, and strength.[59]  During the examination, plaintiff was cooperative, and her

mood and affect were appropriate, with normal judgment and no suicidal ideation.[60]

Plaintiff advised Dr. Szeto of her appointment with Dr. Nguyen, a heart surgeon.  Dr.

Szeto noted "[i]t is unclear why she is going there, [plaintiff] is asymptomatic at this

time."[61]

On July 2, 2010, plaintiff complained to Dr. Szeto of shortness of breath,

coughing, asthma, sleep apnea, difficulty balancing, memory loss, and depression.[62]

Dr. Szeto diagnosed depression, chest pain, hyperlipidemia, hypertension, asthma,

sleep apnea, and emphysema and prescribed Prozac.[63]  Dr. Szeto further noted

plaintiff's "general health status is good," and she was engaging in "routine aerobic

activity, 4-5 times a week" including bicycling, running, and weight lifting.[64]  On July 9,

2010, plaintiff underwent a sleep study which reveled no abnormalities.[65]

Plaintiff returned to the emergency room on August 10, 2010 complaining of

chest pain, shortness of breath, and palpitations.[66]  After blood work and a CT scan of

the chest, she was discharged and instructed to follow-up with her treating

cardiologist.[67]  On August 26, 2010, plaintiff underwent a CT scan of her head with

normal findings.[68]  Plaintiff saw Dr. Szeto on November 10, 2010 and requested weight-

---

[59] *Id.* at 740-41.
[60] *Id.*
[61] *Id.*
[62] *Id.* at 742.
[63] *Id.* at 745-46.
[64] *Id.* at 742-44
[65] *Id.* at 747.
[66] *Id.* at 770-71.
[67] *Id.*
[68] *Id.* at 810.

loss medicine,[69]  for which he prescribed phentermine, an appetite suppressant.[70]

Plaintiff had a follow up appointment with Dr. Rao on March 16, 2011.[71]  He found no interscapular or back pain, and noted she continued her day-to-day activities without much difficulty.[72]  Dr. Rao ordered a repeat CT scan of the chest, and on April 6, 2011, he discussed surgical repair of her thoracoabdominal aneurysm.[73]  The CT scan confirmed a chronic dissection of the ascending aortic arch and the entire descending thoracic aorta, abdominal aorta and left iliac bifurcation, and a secular component in the mid thoracic aorta with a diameter of approximately 5.6 cm.[74]  Plaintiff desired surgery, and on October 6, 2011, Dr. Nguyen performed an aortic arch replacement procedure.[75]

Plaintiff saw Dr. Kelly for an evaluation of her descending aortic dissection repair on October 24, 2011.[76]  Dr. Kelly noted plaintiff tolerated surgery and the stent procedure "reasonably well," and diagnosed thoracic aortic dissection, chest pain, shortness of breath, hypertension, and obesity and advised her to progress with physical activities as tolerated.[77]

On February 1, 2012, at Dr. Szeto's request, plaintiff underwent a CT scan of the lumbar spine to evaluate low back pain that radiated down her left leg, causing

---

[69] *Id.* at 813-14.

[70] *Id.*

[71] *Id.* at 816, 830.

[72] *Id.*

[73] *Id.*  The discussed surgery was a three-stage repair of plaintiff's dissecting aneurysm, as well as a two-stage repair of the proximal aortic arch.  D.I. 12 at 816.

[74] D.I. 12 at 830.

[75] *See* D.I. 11 at 338.

[76] *Id.* at 334.

[77] *Id.*

numbness and tingling.[78]  The scan revealed severe degenerative disk disease at L4-L5, with moderate size disk protrusion causing extradural impression on the spinal cord, as well as, narrowing of the lateral nerve root bilaterally and mild disk protrusion at L3-L4.[79]  Dr. Rao saw plaintiff on June 13, 2012 and concluded her lower extremity pain was unrelated to her aortic dissection and likely due to chronic lumbar degenerative disk disease, for which he referred her to a pain management specialist.[80]

On June 20, 2011, Dr. Szeto checked a box on a form indicating plaintiff "is totally disabled without any consideration of any past or present drug and/or alcohol use."[81]  He checked the same box on an identical form on August 22, 2011.[82]

On September 10, 2012, plaintiff was admitted to Christiana for another surgery, to repair the proximal thoracic aortic dissection.[83]  The primary diagnosis was proximal thoracic aortic dissection, with secondary diagnoses of hypertension, COPD, obesity, and depression.[84]  Plaintiff was discharged on September 14, 2012, with the following medications:  Abilify, Atenolol, Simvastatin, Spiriva, and Trazodone.[85]

## 2.    Mental Health Medical Evidence

On November 30, 2010, plaintiff was admitted to MeadowWood, with symptoms of decreased concentration and memory, loss of energy and interest, poor hygiene, panic attacks, social withdrawal and isolation, generalized anxiety, and anger

---

[78] *Id.* at 380.
[79] *Id.*
[80] *Id.*
[81] D.I. 12 at 825-26.
[82] *Id.*
[83] D.I. 11 at 51.
[84] *Id.* at 42.
[85] *Id.* at 43, 51.

outbursts.[86]  Her diagnosis was major depressive disorder, recurrent, severe, with a

GAF of 20.[87]  She was discharged on December 14, 2010.[88]

On December 20, 2010, plaintiff was seen at Harmonious Mind Psychiatric and

Counseling Services ("Harmonious Mind") for follow-up mental heath treatment

complaining of chest tightness, fearfulness, visual hallucinations of shadows flying in the

air, and audio hallucinations of "static-like" whispering.[89]  Kendall Dupree, M.D. ("Dr.

Dupree") diagnosed plaintiff with major depressive disorder, single episode, severe

without psychotic features, post-traumatic stress disorder ("PTSD"), and polysubstance

dependence in sustained full remission and prescribed Trazodone, Pristig, and

Risperdal.[90]  On January 27, 2011, plaintiff was discharged from Harmonious Mind for

failing to attend scheduled appointments.[91]

On January 31, 2011, plaintiff resumed treatment at Harmonious Mind, reporting

her mood was improved and stable, with no thoughts of self-harm.[92]  Dr. Dupree

diagnosed major depression, PTSD, and polysubstance abuse in full remission, and

---

[86] D.I. 12 at 854-57.

[87] *Id.* at 862. The GAF is a scale ranging from zero to one hundred used by mental health professionals to express an adult's psychological, social, and occupational functions.  A GAF score of 61 to 70 indicates some mild symptoms or only some difficulty in social, occupational, or educational functioning; a score of 51 to 60 indicates mild symptoms or moderate difficulty in social, occupational, or educational functioning; and a score of 41 to 50 suggests serious symptoms or serious impairment in social, occupational, and educational functioning. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS-TEXT REVISION 34 (4th ed. 2000).

[88] *Id.* at 847.

[89] *Id.* at 800, 847.

[90] *Id.* at 801-03.

[91] *Id.* at 804.

[92] *Id.* at 805.

continued Pristiq and Trazodone.[93]

On February 10, 2011, plaintiff reported that Pristiq helped; she had a brighter mood, more motivation, and no depression.[94]  On March 2, 2011, plaintiff complained of irritability for the previous week for unknown reasons, and weight gain from medications.[95]  Dr. Dupree prescribed Abilify and discontinued Risperdal.[96]

Dr. Dupree completed a Psychiatric/Psychological Impairment Questionnaire on August 3, 2011, with diagnoses of bipolar disorder and PTSD, a GAF of 51 and fair prognosis.[97]  His clinical findings included sleep and mood disturbance, recurrent panic attacks, suicidal ideation or attempts, perceptual disturbances, decreased energy, generalized persistent anxiety, hostility, and irritability.[98]  He opined plaintiff's ability to maintain attention and concentration for extended periods, work in coordination with others, cooperation with co-workers or peers and avoiding or exhibiting behavioral extremes as markedly limited.[99]  He concluded her ability to understand, remember, carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, accept instructions, respond appropriately to criticism from supervisors, maintain socially appropriate behavior, and adhere to basic standards of neatness or cleanliness was moderately limited.[100]  Dr.

---

[93] *Id.*

[94] *Id.* at 806.

[95] *Id.* at 807.

[96] *Id.*

[97] *Id.* at 817-24.

[98] *Id.* at 818.  Markedly limited is defined as "effectively precludes the individual from performing the activity in a meaningful manner." D.I. 12 at 819.

[99] D.I. 12 at 820-22.

[100] D.I. 12 at 820-22.  Moderately limited is defined as "significantly affects but does not totally preclude the individual's ability to perform the activity." *Id.* at 819.

Dupree further communicated plaintiff was not malingering; she was able to tolerate low stress work; and she would be absent from work about once a month due to her mental impairments.[101]

### C.    The Administrative Law Hearing

#### 1.    Testimony of Plaintiff

Plaintiff testified at the administrative law hearing that she was unable to work due to psychological, heart, and back problems.[102]   She claimed experiencing chest pain about once a month, lasting three to four minutes, resulting from both physical and emotional stress, which is relieved by laying down.[103]   She takes aspirin for chest pain.[104]   Plaintiff also detailed problems with fatigue, dizziness, and numbness in her left leg.[105]   She experienced depression with insomnia, loss of appetite, panic attacks, reduced energy levels, suicidal ideation, and problems with concentration and memory.[106]   She, however, acknowledged her psychiatric symptoms improved since increases in the dosages of her psychotropic medications.[107]

Plaintiff admitted past problems with crack cocaine and alcohol, but denied any cocaine usage since 2006 or alcohol for a couple of months.[108]   She testified she can walk about a quarter mile, sit for 10-15 minutes before her back and legs hurt; and lift 10

---

[101] *Id.* at 823.
[102] D.I. 11 at 401.
[103] *Id.* at 402-03.
[104] *Id.* at 403.
[105] *Id.* at  402-07.
[106] *Id.* at 409, 416-17.
[107] *Id.* at 412-13.
[108] *Id.* at 417-18.

to 20 pounds.[109]  She spends 8 to 10 hours a day at rest and has difficulty bending and reaching overhead and forward due to back and leg pain.[110]

At the time of the ALJ hearing, plaintiff and her three children, none over the age of twelve, were living with a friend.[111]  Plaintiff testified her friend helped care for her children, performed household chores, cooked, and grocery shopped.[112]  On occasion, plaintiff prepared meals.[113]  Plaintiff engaged in no social activities and watched television.[114]  She received unemployment benefits in 2009 and 2010, and also babysat her niece's son three times a week, four hours a day for four months in 2010.[115]  In an Adult Functional report, plaintiff reported she got along well with authority figures, had never been terminated from employment for co-worker problems, and easily handled changes in routine.[116]

### 2.    Testimony of Vocational Expert

Christina Cody, a VE, also testified at the administrative hearing.[117]  The ALJ

---

[109] *Id.* at 413-14.

[110] *Id.*

[111] *Id.* at 418.

[112] *Id.* at 419-20.

[113] *Id.*

[114] *Id.* at 421.

[115] *Id.* at 423-24.

[116] D.I. 12 at 575-76.  In this Adult Functional Report, plaintiff's testimony is contradicted.  Although she testified her friend cares for her children, she responded "[n]o" to the question in the report "do you take care of anyone else such as a wife/husband, children, grandchildren, parents, friend, other?"  *Id.* at 571.  Her testimony is further contradicted by her positive answer to the question, "[d]o you prepare your own meals," wherein she claimed to prepare "complete meal[s]," but testified she does not.  D.I. 11 at 420; D.I. 12 at 572.  At the hearing, she denied doing laundry because of severe back pain; however in the report, in response to "[l]ist the household chores, both indoors and outdoors, that you are able to do," she circled "laundry."  D.I. 11 at 420; D.I. 12 at 572.

[117] D.I. 11 at 428-39.

asked the VE to assume a hypothetical individual with plaintiff's vocational characteristics who was limited to light work[118] that permitted her to consistently alternate sitting and standing for 20-30 minutes or at will;[119] allowed for mild limitations in pushing/pulling with the left lower extremity;[120] and required no exposure to heights, dangerous machinery, odors, gases, fumes and dust, nor climbing stairs, ropes, and ladders.[121]  The hypothetical individual was further limited to simple, routine, unskilled tasks with an SVP of one to two, requiring only low concentration, stress, and memory, restricted to one to two step tasks with little or no decision making or judgment, minimal changes in the work setting, with no production or pace work, and only occasional interaction with the public, co-workers, and supervisors.[122]  The VE testified the hypothetical individual would be capable of performing various jobs in significant numbers in the national economy.[123]

### D.    The ALJ's Decision

Based on the evidence and testimony, the ALJ determined in his October 19, 2011 opinion that plaintiff was not disabled, and not entitled to DIB and SSI benefits.[124]

---

[118] *Id.* at 432 ("[A person with] those limitations would be able to do some sedentary to light work activities.  Can you give me jobs such a person could do in significant numbers?").

[119] *Id.* at 431.

[120] *Id.* at 432.

[121] *Id.* at 430-32.

[122] *Id.*

[123] *Id.* at 432-33 ("At the light exertional level, a position as a hand bander . . . national numbers, 162,300 . . . a position as a filler . . . national numbers, 134,600 . . . [and] a position as a control worker . . . national numbers, 271,500 . . . . At the sedentary exertional level, a position as a table worker . . . national numbers, 200,500 . . . a position as a bench hand . . . national numbers, 188,600 . . . [and] a position as a final assembler . . . national numbers, 170,500.")

[124] *Id.* at 18-29.

The ALJ's findings are summarized as follows:

1.  The claimant meets the insured status requirements of the Social
    Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since
    January 9, 2009, the alleged onset date (20 CFR 303.1571 *et seq.*,
    and 416.971 *et seq.*).

3.  The claimant has the following sever impairments: depression,
    post-traumatic stress disorder, degenerative disc disease, chronic
    obstructive pulmonary disease and coronary artery disease (aortic
    thoracoabdominal aneurysm) (20 CFR 404.1520(c) and
    416.920(c)).

4.  The claimant does not have an impairment or combination of
    impairments that meets or medically equals the severity of one of
    the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1
    (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925,
    and 416.926).

5.  The claimant has the residual functional capacity to perform light
    work as defined in 20 CFR 404.1567(b) and 416.967(b) except; she
    can sit for 20-30 minutes, stand for 20-30 minutes or at will
    consistently on an alternate basis, 8 hours a day, 5 days a week
    subject to ordinary and customary breaks.  Additionally, she can
    perform simple routine unskilled jobs that are SVP 1-2 in nature
    and only involve low concentration, stress and memory 1-2 step
    tasks with little or no decision-making or changes in the work
    setting or judgment, and no production pace work.  She must avoid
    heights, dangerous machinery, stair climbing, ropes, ladders,
    odors, gases, fumes, and dust.  She can only occasionally interact
    with the public and co-workers and be essentially isolated except
    for occasionally interacting with her supervisor.  She is mildly
    limited in pushing/pulling with her lower left extremity.

6.  The claimant is unable to perform any past relevant work (20 CFR
    404.1565 and 416.965).

7.      The claimant was born on October 15, 1963 and was 45 years old, which is defined as younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 9, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## III.    JURISDICTION

A district court's jurisdiction to review an ALJ's decision regarding disability benefits is controlled by 42 U.S.C. § 405(g).  The statute provides, "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain review of such decision by a civil action."[125]  The Commissioner's decision becomes final when the Appeals Council affirms an ALJ opinion, denies review of an ALJ decision, or when a claimant fails to pursue available administrative remedies.[126]  In the instant matter, the Commissioner's decision became

---

[125] 42 U.S.C. § 405(g) (2002).
[126] *Aversa v. Sec'y of Health & Human Servs.*, 672 F. Supp. 775, 777 (D.N.J. 1987); *see also* 20 C.F.R. § 404.905 (2002).

final when the Appeals Council affirmed the ALJ's denial of benefits.[127]  Thus, this court

has jurisdiction to review the ALJ's decision.

## IV.    PARTIES CONTENTIONS

### A.    Plaintiff's Contentions

Plaintiff urges remand based on the following reasons:[128] (1) The ALJ failed to

follow the treating physician rule;[129] (2) the ALJ failed to properly evaluate plaintiff's

credibility;[130] and (3) the ALJ relied on flawed vocational expert testimony.[131]

### 1.    Application of the Treating Physician Rule

Plaintiff contends the ALJ's determination to give Dr. Dupree's opinion "some

weight" was not supported by substantial evidence.  Plaintiff asserts the ALJ should

have given controlling weight to his opinion,[132]  because his limitations were not

contradicted by the treatment record, but were based on appropriate clinical and

diagnostic evidence.[133]  Plaintiff points out that Dr. Dupree stated, "despite

improvement, [plaintiff] continued to exhibit evidence of sleep disturbance, mood

disturbance, recurrent panic attacks, suicidal ideation or attempts, perceptual

disturbances, decreased energy, generalized persistent anxiety, and hostility and

irritability based on diagnostic clinical interviews."[134]

Plaintiff argues Dr. Dupree's failure to specifically record concentration difficulties

---

[127] D.I. 11 at 1-3.
[128] D.I. 14.
[129] *Id.* at 11-16.
[130] *Id.* at 16-18.
[131] *Id.* at 18-20.
[132] *Id.* at 15.
[133] *Id.* at 12-13.
[134] *Id.* at 13.

and other limitations in his progress notes is not significant[135] and claims "the ALJ erred by assuming [plaintiff's] gap in treatment was due to either a significant improvement or unjustified non-compliance."[136]   Instead, plaintiff contends this gap was most likely due to psychiatric conditions.[137]

Plaintiff contends Dr. Dupree's opinion, if not afforded controlling weight, should be given great weight, pointing to the factors under 20 C.F.R.  § § 404.1527 and 416.927.[138]   Namely, Dr. Dupree treated plaintiff over a long period, the treatment was focused on her disabling mental impairments, the doctor appropriately supported her findings, and is a board-certified psychiatrist.[139]   Lastly, plaintiff argues the ALJ, by not referencing any medical opinions, impermissibly interpreted the medical data on his own in creating the RFC determination.[140]

### 2.    Evaluation of  Plaintiff's Credibility

Plaintiff argues the ALJ improperly assessed her credibility.[141]   Plaintiff initially contends, even though she can "carry out unspecified activities of daily living [this] does not equate with the ability to work a competitive job eight hours a day, forty hours a week."[142]   She argues the ALJ failed to link her alleged non-compliance with the

---

[135] *Id.* (citing *Brownawell v. Astrue*, 554 F.3d 352, 356 (3d Cir. 2008); *Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007); *Leckenby v. Astrue*, 487 F.3d 626, 633 n.7 (8th Cir. 2007)).

[136] D.I. 14 at 13.

[137] *Id.* (quoting *Olmstead v. L.E. by Zimring*, 527 U.S. 581, 610 (1999) (Kennedy, J., concurring)).

[138] D.I. 14 at 14.

[139] *Id.* at 14-15.

[140] *Id.* at 15-16.

[141] *Id.* at 17.

[142] *Id.*

physical and mental treatment to her disabilities, by failing to examine conditions

relevant to a finding of disability.[143]  Lastly, plaintiff points out her testimony regarding

her physical and mental symptoms and resulting limitations was consistent with the

record, and the finding of a lack of credibility was not linked to the record.[144]

### 3.    The Vocational Expert Testimony

Plaintiff argues the RFC the ALJ determined was unsupported by the record;

therefore, the ALJ erred when relying on the VE's testimony in response to a

hypothetical individual with this RFC.[145]  Instead, plaintiff maintains a hypothetical

consistent with Dr. Dupree's limitations should be applied, which would indicate she

could not perform any work.[146]  Plaintiff further contends the ALJ failed to accurately

describe her mental impairments in the question posted to the VE on which the ALJ

relied.[147]

### B.    Defendant's Contentions

Defendant maintains substantial evidence supports the ALJ's determinations:  (1)

Dr. Dupree's opinion was entitled to some, but not controlling weight; (2) the ALJ

properly evaluated plaintiff's credibility; and (3) the ALJ's hypothetical question to the

VE was proper.[148]

Defendant contends Dr. Dupree's treatment notes demonstrated plaintiff's

---

[143] *Id.* at 17-18.
[144] *Id.*
[145] *Id.* at 19.
[146] *Id.*
[147] *Id.*
[148] D.I. 17 at 1-2.

depression improved.[149]  Over time, she became stable, motivated, brighter, and less

depressed.[150]  Defendant notes Dr. Szeto consistently reported normal psychiatric

examinations with an appropriate mode and affect, normal judgment, and no suicidal

ideation.**[151]**  Defendant, therefore, argues the ALJ reasonably adopted Dr. Dupree's

opinion to the extent it was consistent with the record as a whole.[152]

Defendant points out "although plaintiff suggests that her non-compliance with

her treatment regimen was the result of her mental illness, this is not supported by the

record."[153]  Rather, plaintiff has the burden of demonstrating the cause of her non-

compliance through evidence, and not by a general statement.[154]  Defendant argues the

ALJ did not ignore the medical evidence in assessing plaintiff's mental RFC, but

adopted many of Dr. Dupree's findings.[155]

Defendant contends the ALJ's finding that plaintiff's subjective complaints were

not fully credible is supported by substantial evidence.[156]  Defendant points out the ALJ

found plaintiff's medically determinable impairments could reasonably cause the alleged

symptoms, but her statements concerning the intensity, persistence, and limiting effects

of those symptoms were inconsistent with the objective medical evidence.[157]  Defendant

notes the ALJ, as the finder of fact, is entitled to great weight and deference when

---

[149] *Id.* at 12-13.
[150] *Id.*
[151] *Id.* at 12-13.
[152] *Id.*
[153] *Id.* at 12.
[154] *Id.*
[155] *Id.* at 14.
[156] *Id.* at 15.
[157] *Id.*

determining credibility.[158]

Defendant maintains the ALJ's hypothetical question to the VE accounted for all credible limitations,[159] and "the ALJ was not required to adopt the VE's responses . . . premised on limitations . . . not supported by the evidence."[160]

## V.    STANDARD OF REVIEW

### A.    Summary Judgment

In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the nonmoving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[161]  If there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[162] This standard does not change merely because there are cross-motions for summary judgment.[163]  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[164]

"The filing of cross-motions for summary judgment does not require the court to grant

---

[158] *Id.* at 17-18.

[159] *Id.* at 18.

[160] *Id.* (quoting *Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d Cir. 1987)).

[161] *Reeves v. Sanderson Plumbing, Prods., Inc.*, 530 U.S. 133, 150 (2000).

[162] *See Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

[163] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[164] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

summary judgment for either party."[165]

## B.  ALJ's Findings

Section 405(g) sets forth the standard of review for the ALJ's decision.[166]  The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not provide substantial evidence in support.[167]  Factual decisions are upheld if supported by substantial evidence.[168]  Substantial evidence means less than a preponderance, but more than a mere scintilla of evidence.[169]  As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[170]

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence.[171]  The court's review is limited to evidence actually presented to the ALJ.[172]  The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence

---

[165] *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

[166] *See* 42 U.S.C. § 405(g).

[167] *Id.*

[168] *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Hecklem*, 806 F.2d 1185, 1190 (3d Cir. 1986).

[169] *See Rutherford v. Barnhart*, 399 F.3d 546, 522 (3d Cir. 2005).

[170] *Pierce v. Underwood,* 487 U.S. 552, 565 (1988).

[171] *See Monsour*, 806 F.2d at 1190.

[172] *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001).

offered by treating physicians) or if it really constitutes not evidence but mere conclusion."[173]  The inquiry is not whether the court would have made the same determination, but rather whether the Commissioner's conclusion was reasonable.[174] Even if the court would have decided the case differently, it must defer to the ALJ, and affirm so long as that decision is supported by substantial evidence.[175]

When review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision.[176]  In *Securities & Exchange Comm'n v. Chenery Corp.*,[177] the Supreme Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."[178]  The Third Circuit has recognized the applicability of this finding in the Social Security disability context.[179]  This court's review is limited to the four corners of the ALJ's decision.[180]

## VI.    DISCUSSION

### A.    Disability Determination

Title II of the Social Security Act, 42 U.S.C. § 423(a)(I)(D), "provides for the

---

[173] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).
[174] *See Brown v. Brown*, 845 F.2d 1211, 1213 (3d Cir. 1988).
[175] *See Monsour*, 806 F.2d at 1190-91.
[176] *See Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).
[177] *Sec. & Exch. Comm'n v. Chenery Corp.*, 322 U.S. 194, 196 (1947).
[178] *Id.*
[179] *Fargnoli v. Massanari,* 247 F.3d 34, 44, n.7 (3d Cir. 2001).
[180] *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005).

payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."[181]  In order to qualify for DIB, the claimant must establish she was disabled prior to the date she was last insured.[182]  A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death, or has lasted or can be expected to last for a continuous period of at least 12 months.[183]  To be disabled, the severity of the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy."[184]

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.[185]  If a finding of disability can be made at any point in the sequential analysis, the Commissioner will not review the claim further.[186]  At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.  If the claimant is so engaged, a finding of non-disabled is required.[187]  If the claimant is not, then step two requires the Commissioner to determine whether the claimant is suffering from severe impairment or a combination of impairments that is severe.  If the claimant is not suffering from either, a finding of non-disabled is required.[188]

---

[181] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).
[182] 20 C.F.R. § 404.131.
[183] 42 U.S.C. §§ 423(d)(I)(A), 1382(c)(a)(3).
[184] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).
[185] 20 C.F.R. § 404.1520(a)(4).
[186] 20 C.F.R. § 404.1520(a)(4).
[187] 20 C.F.R. § 404.1520(a)(4)(i).
[188] 20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listing") that are presumed severe enough to preclude any gainful work.[189]  When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.[190]  If a claimant's impairment, either singularly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five.[191]  At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work.[192]  A claimant's RFC is "that which an individual is still able to do despite the limitations caused by [her] impairment(s)."[193]  "The claimant bears the burden of demonstrating an inability to return to [her] past relevant work."[194]

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work.[195]  At this last step, the burden rests with the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past work experience and RFC before denying disability benefits.[196]  In making this determination, the ALJ must analyze the cumulative effect of

---

[189] 20 C.F.R. § 404.1520(a)(4)(iii); *see also Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).

[190] 20 C.F.R. § 404.1520(a)(4)(iii).

[191] 20 C.F.R. § 404.1520(e).

[192] 20 C.F.R. § 404.1520(a)(4)(iv); *see also Plummer*, 186 F.3d at 428.

[193] *Fargnoli*, 247 F.3d at 40.

[194] *Plummer*, 186 F.3d at 428.

[195] 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *see also Plummer*, 186 F.3d at 428.

[196] *Id.*

all the claimant's impairments, and often seeks the assistance of a VE.[197]

### 1.    Dr. Dupree's Opinion

When determining plaintiff's RFC, the ALJ accorded some weight to Dr. Dupree's opinion.[198]  The ALJ disagreed with the opinion concerning plaintiff's limitations "in the areas of social interact[ion] or . . .  her concentration, persistence and pace."[199]

The Third Circuit has held, "[t]reating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"[200]  A court must give greater weight to the findings of a treating physician than to those of a doctor who examined the claimant only once or not at all.[201]  When a physician has treated a patient over an extended period of time, his opinion is usually afforded great weight.[202]  A treating physician's opinion is given controlling weight if  "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence [in the] case record.[203]

A final disability determination must not conflict with an opinion deserving of controlling weight.[204]  An ALJ may reject a treating physician's opinion "only on the basis of contradictory medical evidence."[205]  That opinion may not be rejected for no reason or

---

[197] *See id.*

[198] D.I. 11 at 27.

[199] *Id.*

[200] *Plummer*, 186 F.3d at 429 (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)).

[201] *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).

[202] *See Dass v. Barnhart*, 386 F. Supp. 2d 568, 576 (D. Del. 2005).

[203] *Fargnoli*, 247 F.3d at 43.

[204] *See Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000).

[205] *Id.*

the wrong reason.[206]  When there is contradictory medical evidence, the ALJ must carefully evaluate how much weight to give the treating physician's opinion, and provide an explanation as to why the opinion is not given controlling weight.[207]

"A decision not to give a treating physician's opinion controlling weight must not automatically become a decision to give a treating physician's opinion no weight whatsoever."[208]  Instead, "treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR [§§] 404.1527 and 416.927."[209]  These factors include the treating relationship, the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician.[210]

In providing some weight to portions of Dr. Dupree's opinion, the ALJ relied on the doctor's own treatment notes, which recorded plaintiff's improvement over time and oriented in all spheres with an alert level of consciousness.[211]  Dr. Dupree's treatment notes indicated plaintiff was "stable, motivated, brighter and less depressed."[212]  The ALJ also pointed out Dr. Dupree's treatment notes noted plaintiff was cooperative,[213] and never lacked concentration.[214]  The ALJ found such lack of documentation, "makes

---

[206] *Id.* at 317.
[207] *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008).
[208] *Id.*
[209] *Id.*
[210] *Id.*
[211] D.I. 11 at 27.
[212] *Id.*
[213] *Id.*
[214] *Id.*

the marked finding in this area of function quite conclusory."[215]  Lastly, the ALJ noted a

gap in treatment between March 24, 2011, and August 3, 2011, which suggested either

plaintiff improved or was non-complaint with the prescribed treatment.[216]  The ALJ's

findings are based on the medical record as a whole, as evidenced by his statement,

"treatment notes show[ing] that with medication compliance the [plaintiff's] symptoms

were controlled [and plaintiff] is not refractory to treatment."[217]  The ALJ also noted that

Dr. Dupree's opinion was not well supported by medically acceptable clinical and

laboratory techniques.[218]

    As a result, based on the treatment relationship, a lack of support from relevant

medical evidence, inconsistencies with the medical record as a whole, and a lack of

support from medically acceptable clinical and laboratory techniques, the ALJ's

affording of some weight to Dr. Dupree's opinion was appropriate and supported by

substantial evidence.

## 2.    Plaintiff's Credibility

    Under the two prong test for evaluating credibility, the ALJ must first "consider

whether there is an underlying medically determinable physical or mental impairment(s)

. . . that could reasonably be expected to produce the individual's pain or other

symptoms."[219]  Second, the ALJ "must evaluate the intensity, persistence, and limiting

effects of the individual's symptoms to determine the extent to which the symptoms limit

---

[215] *Id.*
[216] *Id.*
[217] *Id.*
[218] D.I. 11 at 27 (citing D.I. 12 at 818).
[219] SSR 96-7p, 1996 WL 374186.

the individual's ability to do basic work activities."[220]  The ALJ must then "make a finding

on the credibility of the individual's statements based on a consideration of the entire

record."[221]

> The seven factors assessed in determining credibility are:
>
> (1) the individual's daily activities; (2) the location, duration, frequency,
> and intensity of the individual's pain or other symptoms; (3) factors that
> precipitate and aggravate the symptoms; (4) the type, dosage,
> effectiveness, and side effects of any medication the individual takes or
> has taken to alleviate pain or other symptoms; (5) treatment, other than
> medication, the individual receives or has received for relief of pain or
> other symptoms; (6) any measures other than treatment the individual
> uses or has used to relieve pain or other symptoms; (7) any other factors
> concerning the individual's functional limitations and restrictions due to
> pain or other symptoms.[222]

The ALJ made a determination that plaintiff was limited by the combined effects

of her mental impairments, but based on the medical record as a whole, the ALJ found

she was not impaired to the degree alleged.[223]  The ALJ noted, "Dr. Nguyen

recommended [plaintiff] undergo a thoracoabdominal dissecting aneursym

procedure."[224]  The ALJ, however, stated plaintiff had not followed this recommendation,

which suggested the allegations of pain were not as severe as plaintiff testified.[225]  The

ALJ further noted Dr. Szeto's opinion that plaintiff was capable of carrying out her day-

to-day activities without much difficulty, and he placed no restrictions or limitations on

her.[226]  This further suggested plaintiff's alleged impairments were not a sever as she

---

[220] *Id.*
[221] *Id.*
[222] *Id.*
[223] D.I. 11 at 26.
[224] *Id.*
[225] *Id.*
[226] *Id.*

represented.

The ALJ also found plaintiff failed to comply with other recommendations by her doctors, by stating, "[plaintiff] is not complaint with other advice given, such as, to discontinue smoking and continued dieting."[227]  The ALJ continued "[plaintiff] was also repeatedly advised to continue with psychiatric therapy and comply with her prescribed medications; however, according to the record she has not consistently received treatment."[228]  There is further record evidence of plaintiff's own statements which contradict her testimony.[229]

As a result, based on a lack of support and inconsistencies from relevant medical evidence, and  the record as a whole, the ALJ's finding of plaintiff's lack of credibility as to the degree of impairments was appropriate and supported by substantial evidence.

## C.    The RFC

Plaintiff contends the ALJ, by not referencing any medical opinions, impermissibly interpreted the medical data on his own in creating the RFC.[230]  The ALJ, however, did reference medical opinions when creating the RFC.  As indicated *supra*, the ALJ referenced Dr. Dupree's medical data and determined to afford some weight to his opinion.[231]  The ALJ further considered Dr. Yerneni's treating notes and opinion, which indicated he advised plaintiff to seek pain management treatment and discontinue smoking, however she did not follow this advise.[232]  The ALJ also noted plaintiff

---

[227] *Id.*
[228] *Id.*
[229] *See supra* note 116.
[230] D.I. 14 at 15-16.
[231] *See supra* VI.A.1.
[232] D.I. 11 at 24.

underwent an iliac celiac artery dissection in 2006, she was diagnosed with spondylosis/osteoarthritis of the lumbar spine, and underwent an MRI of the brain in 2009, and a CT scan of the brain in 2010.[233]

The ALJ further referenced Dr. Kelly's treatment record and opinion, noting he found no evidence of cardiac injury and suggested the use of Beta-blockers.[234]  The ALJ noted Dr. Szeto's diagnostic opinion of thoracic aneurysm and unstable dissection within plaintiff's chest.[235]  The ALJ cited Dr. Szeto's opinion that plaintiff's range of motion and strength of her musculoskeletal system were within normal limits with no tenderness, swelling, or deformity, and she had normal giat.[236]  The ALJ considered Dr. Szeto's opinion that plaintiff's health status was fair, lungs were clear to auscultation, respirations were non-labored, breath sounds were equal/symmetrical to the chest wall, and she was alert, oriented, and exhibited normal sensory and motor function without focal defects.[237]

The ALJ also considered Dr. Rao's opinion of dissection of the thoracic aortic which extended from the ascending thoracic aorta to the abdominal aortic bifurcations, without evidence of extravasation of contrast of the abdominal or theoracic aorta.[238]  The ALJ also noted, Dr. Rao' diagnostic opinion that plaintiff had no significant carotid artery disease or peripheral arterial disease and both

---

[233] *Id.*
[234] *Id.*
[235] *Id.* at 24-25.
[236] *Id.* at 25.
[237] *Id.*
[238] *Id.*

carotid arteries were patent with no significant carotid artery or peripheral arterial disease.[239]

The ALJ noted Dr. Dupree's opinion was given some weight and Dr. Szeto's opinion was given little weight.[240]  The ALJ further gave some weight to Dr. Rao's opinion.[241]  By evaluating Dr. Dupree, Szeto, and Rao's opinions, the ALJ did reference medical opinions in creating the RFC.  As a result, the RFC is appropriate and supported by substantial evidence.

### D.    VE Testimony

VE testimony in response to a hypothetical question that fairly sets forth every credible limitation established by the physical evidence is substantial evidence.[242] "While the ALJ may proffer a variety of assumptions to the expert, the VE's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments."[243]  "If, however, an ALJ poses a

---

[239] *Id.*

[240] D.I. 11 at 27.  The ALJ assigned little weight to Dr. Szeto's opinion, because he found plaintiff was totally disabled, which the ALJ noted was inconsistent with her own treatment notes.  *Id.*  Namely, Dr. Szeto's notes indicate plaintiff denied any problems with her respiratory, musculoskeletal, or neurological system, and examinations always found normal range of motion and strength without pain regarding her musculoskeletal system.  *Id.*

[241] D.I. 11 at 27.  Dr. Rao's opinion was given some weight, because the ALJ found the medical record as a whole showed, with medication compliance, plaintiff's symptoms are basically controlled.  *Id.*  The ALJ found Dr. Rao's opinion indicated plaintiff's subjective complaints were mainly considered over his clinical notes.  *Id.*  The ALJ also noted his findings were not well supported by medically acceptable clinical and laboratory techniques.  *Id.*

[242] *See Plummer*, 186 F.3d at 431.

[243] *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).

hypothetical question to a [VE] that fails to reflect 'all of a claimant's impairments that are supported by the record, . . . it cannot be considered substantial evidence.'"[244]  An ALJ is not required to credit VE testimony elicited in response to a hypothetical question that includes limitations the ALJ finds not to be credible.[245]

In the present matter, the ALJ, based on substantial record evidence, found plaintiff's limitations to be: 1) sit or stand for 20-30 minutes or at will consistently; 2) work an 8 hour work day subject to ordinary and customary breaks; 3) perform simple routine and unskilled jobs, involving low concentration, stress and memory 1-2 step tasks with little or no decision-making or changes in work setting or judgment; 4) avoid heights, dangerous machinery, stair climbing, ropes, ladders, odors, and gases, fumes and dust; 5) only occasionally interact with the public and co-workers; 6) essentially be isolated except for occasional interactions with her supervisor; and 7) mildly limited in pushing and pulling with her lower left extremity.[246]  The question posed by the ALJ to the VE included all of these limitations.

The question posed to the VE included limitations one and two by the statement, "can stand for 20 or 30 minutes, sit for 20 or 30 minutes, or at will consistently, or an alternate basis eights hours a day, give days a week, subject to her regular and usual customary breaks."[247]  Plaintiff's third limitation was incorporated as evidenced by the

---

[244] *Rutherford*, 399 F.3d at 553 (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).

[245] *Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d Cir. 1987) ("Inasmuch as the [ALJ] did not have to accept [plaintiff]'s testimony, he did not have to credit . . . expert testimony that was predicated upon it.").

[246] D.I. 11 at 23.

[247] *Id.* at 431.

ALJ providing "[f]ailure to maintain her concentration, persistence, and pace due to her pain, and depression, and/or posttraumatic stress disorder, and as a result we need to add jobs that are simple, routine, and unskilled jobs . . . SVP 1 or 2 in nature. She's able to attend tasks, meet schedules, and by low-stress, low-concentration, and low-memory, I mean that are one or two-step tasks. No production rate jobs, jobs that have little or no decision-making in them, or changes in the work setting."[248]  The fourth limitation was covered by the statement, "jobs that would allow her to avoid heights and hazardous machinery . . .  no prolonged climbing, or balancing, and stooping.  And by that I mean jobs that are – would require only once or twice an hour to do that, in which stair climbing, ropes, and ladders."[249]  The ALJ's question further included plaintiff's fifth and sixth limitations as evidenced by, "jobs that would have little to no interaction with the public except on an occasional basis.  Interaction with the workers, same; jobs that can be given or be around things rather than people, and jobs that would be essentially isolated with occasional supervision."[250]  Plaintiff's last limitation was considered by the ALJ's comment, "mildly limited as to push and pull in that left lower extremity."[251]

As a result, the ALJ's findings are supported by substantial record evidence and all limitations in the RFC finding were included in the hypothetical question posed to the VE.  Therefore, reliance on the VE testimony in response to the hypothetical individual was appropriate and supported by substantial evidence.

## VII.   ORDER AND RECOMMENDED DISPOSITION

---

[248] *Id.* at 430-31.
[249] *Id.* at 431.
[250] *Id.*
[251] *Id.* at 431-32.

For the reasons contained herein, it is recommended that:

(1) Defendant's cross-motion for summary judgment (D.I. 13) be GRANTED

(2) Plaintiff's motion for summary judgement (D.I. 16) be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Date: May 20, 2014                                    /s/  Mary Pat Thynge_____
                                                              UNITED STATES MAGISTRATE JUDGE