IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROSELY ALTAGRACIA STOKES,

        Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

Civil Action No. 13-1479-RGA

MEMORANDUM OPINION

Sommer L. Ross, Esq., Duane Morris LLP, Wilmington, DE; Eddy Pierre Pierre, Esq., Law Offices of Harry J. Binder and Charles E. Binder, P.C., New York, NY, Attorneys for Plaintiff.

Nora Koch, Acting Regional Chief Counsel Social Security Administration, Office of the General Counsel, Philadelphia, PA; Charles M. Oberly, III, United States Attorney, Wilmington, DE; Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel, Philadelphia, PA, Attorneys for Defendant.

November 26, 2014

/s/ Richard G. Andrews
ANDREWS, U.S. District Judge:

Plaintiff, Rosely Altagracia Stokes, appeals the decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §§ 401-433, 1381-1383f. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3).

Presently pending before the Court are cross-motions for summary judgment filed by Stokes and the Commissioner. (D.I. 13, 16). The case was referred to the United States Magistrate Judge, who issued a Report and Recommendation (D.I. 19) recommending that Stokes' motion be denied and the Commissioner's motion be granted. Stokes filed objections (D.I. 20) to which the Commissioner has responded. (D.I. 21). I review the objections *de novo*. For the reasons set forth below, the Court grants Plaintiff's motion for summary judgment, denies the Commissioner's motion, and remands for further proceedings.

I. BACKGROUND

A. Procedural History

Stokes filed her applications for DIB on November 9, 2009 and SSI[1] on November 27, 2009, alleging disability beginning on January 9, 2009, due to a heart condition, back problems, and numbness in her arm and back. (D.I. 10 & 11 (hereafter "Tr.") at 440, 460-61, 470, 478-79). Stokes' applications were initially denied on May 19, 2010 and again were denied upon reconsideration on September 28, 2010. *Id.* Thereafter, a hearing was held before an Administrative Law Judge (the "ALJ") on August 30, 2011. (Tr. at 398-439). The ALJ issued an unfavorable decision on October 9, 2011. (Tr. at 18-29). The Appeals Council denied Stokes'

---

[1] Eligibility for SSI is derivative of qualification for DIB. For ease of reference, the Court will refer only to DIB.

1

request for review on June 26, 2013. (Tr. at 1-4). Stokes filed this lawsuit on August 26, 2013. (D.I. 1).

## B. Plaintiff's Medical History, Condition, and Treatment

### 1. *Medical Evidence*

At the time of the ALJ's decision, Stokes was 48 years old and defined as a "younger person" under 20 CFR § 404.1563(c). (Tr. at 29, 536, 602). Stokes has a ninth grade education and has relevant work experience as a hand packager, machine operator, assembler, warehouse worker, and housekeeper. (Tr. at 423-23, 428).

Stokes' detailed medical history is contained in the record, but the Court will provide a brief summary of the pertinent evidence. Stokes suffers from degenerative disc disease, chronic obstructive pulmonary disease, coronary artery disease, as well as depression and post-traumatic stress disorder. (Tr. at 21, 602).

In 2006, prior to the onset of her alleged disabilities, Stokes underwent open heart surgery for a thoracic aortic aneurysm, followed by a month of intensive care. (Tr. at 622). Stokes suffers from emphysema, which has been stable since 2006. (Tr. at 683). On January 21, 2008, and again on March 31, 2008, Dr. Madhavi Y. Yerneni, M.D. treated Stokes. (Tr. at 620-23). Dr. Yerneni diagnosed Stokes with hyperlipidemia/dyslipidemia, hypertension, asthma, spondylosis/osteoarthritis of the spine, chest pain, and depression. *Id.*

On April 9, 2008, during a follow-up visit, Stokes complained to Derreck Robinson MS PA-C of "needle-like" thoracic back pain. (Tr. at 624). Dr. Yerneni prescribed Tramadol and referred Stokes to physical therapy. (Tr. at 626). On September 19, 2008, Stokes returned to Dr. Yerneni, because progressive thoracic pain prevented her from working. (Tr. at 632). Dr. Yerneni diagnosed thoracic spine tenderness with paresthesias and suspected a herniated disk.

2

(Tr. at 633). On September 25, 2008, Stokes went to the Rhode Island Hospital emergency room complaining of shortness of breath and chest pain radiating to her back. (Tr. at 608-09). An MRI of the thoracic spine showed mild degenerative changes. (Tr. at 637). On February 4, 2009, Stokes reported to Dr. Yerneni that her back pain improved because she was no longer working. (Tr. at 640). On August 11, 2009, Stokes informed Dr. Yerneni she was doing well without shortness of breath or chest pain, but had experienced episodes of vertigo. (Tr. at 655).

On November 4, 2009, Stokes saw Dr. Irene Szeto, M.D. for recurrent leg pain and dizziness. (Tr. at 724). Dr. Szeto diagnosed hyperlipidemia and hypertension, prescribed Benazepril, and referred Stokes to a vascular surgeon. (Tr. at 725). On November 25, 2009, Stokes saw Dr. Bhaskar Rao, M.D., complaining of lower leg pain that increased when walking long distances. (Tr. at 837-38). Dr. Rao ordered a CT angiography. (Tr. at 838). The CT angiography revealed a chronic type A aortic dissection. (Tr. at 835). On December 16, 2009, Stokes was referred to the emergency department and evaluation by a cardiac surgeon, John Kelly III, M.D., who found Stokes was stable and that her condition did not require surgery. *Id.* Dr. Kelly noted that Stokes' chest pain worsened with emotional stress. (Tr. at 705). Dr. Kelly recommended close follow-up regarding Stokes' chronic thoracoabdominal aortic dissection and treatment with beta blockers. *Id.* A treadmill test, administered on December 23, 2009, suggested that Stokes' lower leg pain was not arterial, but neuromuscular in nature. *Id.* On February 23, 2010, Dr. Szeto diagnosed Stokes with aortic dissection, restless leg syndrome, carpal tunnel syndrome, hyperlipidemia, and hypertension. (Tr. at 714-15). On April 6, 2010, Dr. Szeto noted that during the appointment, Stokes was cooperative, had an appropriate mood and affect, evidenced normal judgment, and was non-suicidal. (Tr. at 741). On a July 2, 2010, Stokes complained to Dr. Szeto of shortness of breath, coughing, apnea, abnormal balance, and

3

memory loss. (Tr. at 742). Dr. Szeto diagnosed Stokes with depression, but noted that Stokes' general health status was good and that Stokes reported she was engaged in aerobic activity four to five times per week. *Id.*

On October 6, 2011, Dr. Heip Nguyen performed open heart surgery on Stokes for an aortic arch replacement. (Tr. at 338). Stokes underwent another open heart surgery on September 10, 2012 to repair the proximal aortic thoracic dissection. (Tr. at 53).

On February 1, 2012, Dr. Szeto ordered a CT scan of Stokes' lumbar spine. (Tr. at 380). The CT scan revealed severe degenerative disk disease at L4-L5 with a moderate size disk protrusion causing extradural impression on the spinal cord, a narrowing of the lateral nerve root bilaterally, and mild disk protrusion at L3-L4. *Id.* Dr. Rao concluded that Stokes' lower extremity pain was caused by the chronic lumbar degenerative disk disease and referred Stokes to a pain management specialist. (Tr. at 338).

Dr. Szeto twice indicated on a form that, in her medical opinion, Stokes "is totally disabled" on June 20, 2011 and August 22, 2011. (Tr. at 825-26).

### 2. *Mental Health Evidence*

On November 30, 2010, Stokes was admitted to a mental health facility. (Tr. at 862). Stokes complained of having a mix of depressive and anxiety symptoms including suicidal ideas and psychotic symptoms. (Tr. at 854). Stokes exhibited symptoms of marginal concentration, marginal hygiene, anxiousness, hopelessness, poor insight and judgment, insomnia, hallucinations, social withdrawal, angry outbursts, and panic attacks. (Tr. at 857-59). Stokes was diagnosed with recurrent and severe major depressive disorder. (Tr. at 865). Stokes was discharged on December 14, 2010. (Tr. at 867). On January 14, 2011, Dr. Kendall Dupree, M.D. diagnosed Stokes with major depressive disorder, post-traumatic stress disorder ("PTSD"), and

4

polysubstance abuse in sustained full remission. (Tr. at 802). Dr. Dupree prescribed Trazodone, Pristiq, and Risperdal. (Tr. at 803). On January 7, 2011 and January 17, 2011, Stokes missed two appointments with Mariella Roberts, a counselor. (Tr. at 801, 803). Stokes missed another appointment with Dr. Dupree on January 28, 2011. (Tr. at 804).

On January 31, 2011, Stokes reported to Dr. Dupree her mood was stable, improved, less dysphoric, and that she no longer had thoughts of self-harm. (Tr. at 805). On February 10, 2011, Stokes reported to Dr. Dupree that Pristiq helped, her mood was brighter, and that she was more motivated and less depressed. (Tr. at 806). On March 2, 2011, Dr. Dupree noted that Stokes expressed a reemergence of irritability, but otherwise had fewer complaints of depression. (Tr. at 807). Stokes missed an appointment with Dr. Dupree on March 24, 2011. (Tr. at 808).

On August 3, 2011, Dr. Dupree completed a Psychiatric/Psychological Impairment Questionnaire. (Tr. at 817-24). Dr. Dupree listed Stokes' diagnosis as bipolar disorder and PTSD with a prognosis of fair. (Tr. at 817). Dr. Dupree found that Stokes suffered from sleep and mood disturbance, panic attacks, suicidal ideation, perceptual disturbance, decreased energy, anxiety, hostility, and irritability. (Tr. at 818). Dr. Dupree opined that Stokes' ability to maintain attention and concentration for extended periods, cooperate with co-workers, and avoid behavioral extremes was "markedly limited." (Tr. at 820-22). Dr. Dupree opined that Stokes' ability to understand, remember, and carry out detailed instructions, to respond appropriately to criticism, to maintain socially appropriate behavior, and to maintain cleanliness were moderately limited. *Id.* Dr. Dupree opined that Stokes could tolerate low-stress work. (Tr. at 823).

### C. ALJ Decision

In his October 19, 2011 decision, the ALJ found that Stokes had severe impairments of depression, PTSD, degenerative disk disease, chronic obstructive pulmonary disease and coronary

5

artery disease, but these severe impairments did not meet a listing. (Tr. at 21). The ALJ further found that Stokes had the residual functional capacity ("RFC") to perform light work, with the additional limitations: (1) Stokes can sit for 20-30 minutes, and stand for 20-30 minutes or at will on an alternating basis, eight hours per day, five days per week with customary breaks; (2) Stokes can perform simple routine jobs involving low concentration, stress, and memory with little or no decision-making, changes, judgment, and no production pace; (3) Stokes must avoid heights, dangerous machinery, stairs, ropes, ladders, odors, gases, fumes, and dust; (4) Stokes can only occasionally interact with the public, co-workers, and supervisors; and (5) Stokes has limited pushing or pulling with her lower left extremity. (Tr. at 23). Based on this RFC, the ALJ determined that Stokes could not perform her past work, but that significant numbers of jobs exist in the national economy that Stokes could perform. (Tr. at 28). Accordingly, the ALJ concluded Stokes was not disabled. (Tr. at 29).

## II. LEGAL STANDARD

### A. Standard of Review

The District Court, upon objections being made to the Magistrate Judge's Report and Recommendation in a social security disability proceeding, will undertake a *de novo* review of the recommendations to which the objection(s) was made. *See* 42 U.S.C. § 636(b)(1)(B); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). This review requires the Court to re-examine all the relevant evidence in deciding whether to uphold or reverse the Commissioner's finding. *See id.* The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the

United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2011). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citations omitted).

The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. evidence offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 143 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

### B. Disability Determination Process

Title II of the Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). To qualify for DIB, the claimant must

7

establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in a substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. If the claimant is not suffering from a severe impairment or a severe combination of impairments, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

At step three, if the claimant's impairments are severe, the Commissioner compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. If a claimant's impairment or its medical equivalent matches an impairment in the listing, then the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments or impairment combination are not listed or medically equivalent to any listing, then the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (citations omitted). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is able to return to her past relevant work, the claimant is not disabled. *See id*.

If the claimant is unable to return to past relevant work, step five requires the Commissioner to determine whether the impairments preclude the claimant from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating "not disabled" finding if claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the

cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## III. DISCUSSION

Stokes makes three primary objections. (D.I. 20 at 2). First, Stokes argues that the ALJ failed to follow the treating physician rule by only giving Dr. Dupree's opinion "some weight" and not the proper controlling weight in determining Stokes' RFC. *Id.* Second, Stokes argues that the ALJ failed to properly evaluate her credibility in determining her RFC. *Id.* Third, Stokes argues that the ALJ relied on flawed vocational expert testimony. *Id.*

### A. ALJ Failed to Follow the Treating Physician Rule

Stokes argues that the ALJ improperly gave Dr. Dupree's opinion only "some weight" when Dr. Dupree's opinion was entitled to controlling weight. *Id.* A treating source's opinion on the nature and severity of the claimant's impairment will be given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2). Regarding psychiatric impairments, the Sixth Circuit has held:

> When mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (internal citation omitted).

Further, "while the ALJ may weigh the credibility of the evidence, she must give some indication of the evidence she rejects and her reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43 (citing *Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 120 (3d Cir.

10

2000)). In assessing the credibility of psychiatric evidence, appellate courts have held that observations contained in a treating psychiatrist's notes that the claimant's mental condition is "stable and well-controlled," that a claimant's mental condition improved, and other generally positive remarks do not undermine a treating psychiatrist's determination that a claimant is disabled. *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000); *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001). Additionally, a lack of mental limitations recorded in a treating psychiatrist's notes is not inconsistent with a treating psychiatrist's determination that a claimant is disabled. *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008) (citing *Morales,* 225 F.3d at 319). There is a distinction between a doctor's notes for purposes of treatment and a doctor's ultimate opinion on the claimant's ability to work. *Id.*

If the ALJ finds there is insufficient evidence to give a treating physician's opinion controlling weight, the opinion is not automatically rejected. *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008). "[T]he ALJ must still carefully evaluate how much weight to give the treating physician's opinion." *Id.* The ALJ must consider: "[the] treatment relationship, length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)-(6)). A treating physician's opinion may still be accorded "great weight" if the opinion "'reflect[s] expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler,* 826 F.2d 1348, 1350 (3d Cir.1987)).

11

Here, the ALJ gave Dr. Dupree's opinion only "some weight" because the ALJ disagreed with Dr. Dupree's opinion that Stokes has "marked limitations in the areas of social interacting or with her concentration, persistence and pace." (Tr. at 27). The ALJ found Dr. Dupree's treatment notes to be inconsistent with this determination because Dr. Dupree's notes stated that "the claimant has improved over time and [over time] she was noted as stable, motivated, brighter and less depressed," and that "with medication compliance the claimant's symptoms were controlled." *Id.* Additionally, the ALJ noted that Stokes was "never documented as lacking any form of concentration." *Id.* The ALJ found that the gap in treatment from March 24, 2011 to August 3, 2011 suggested that Stokes "had improved or become non-compliant with the prescribed treatment." *Id.* Lastly, the ALJ found that Dr. Dupree's determination was "not well supported by medically acceptable clinical and laboratory techniques." *Id.*

The ALJ's finding that Dr. Dupree's opinion was not fully credible is improper. First, Dr. Dupree's observations that Stokes' mental condition had improved and that she was less depressed does not contradict Dr. Dupree's opinion that Stokes is markedly limited in the areas of social interaction and attention and concentration for extended periods. As the Seventh Circuit has observed, "There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce…" *Scott*, 647 F.3d at 739.

Second, because a psychiatrist's notes taken for the purpose of treatment do not necessarily reflect a psychiatrist's observations regarding whether a claimant can work, the fact that Dr. Dupree did not record Stokes' limitations in social interaction and concentration, persistence and pace in the treatment notes does not undermine Dr. Dupree's opinion that Stokes was limited in these areas. *Brownawell*, 554 F.3d at 356. Simply because Dr. Dupree recorded mental

12

improvements, and did not record the limitations on Stokes' capacity to work, does not render Dr. Dupree's opinion less credible.

Third, the ALJ's determination that Dr. Dupree's determination was not well supported by medically acceptable clinical and laboratory techniques is incorrect. Dr. Dupree identified "clinical interview" as the "laboratory and diagnostic test results which demonstrate and/or which support your diagnosis." (Tr. at 818). This is an acceptable diagnostic technique in cases where the disability claim is based on mental illness. *Blankenship*, 874 F.2d at 1121. The ALJ offers no additional explanation or evidence for why the clinical interviews are not acceptable clinical and laboratory technique in this case. (Tr. at 27). Therefore, contrary to the ALJ's assertion, Dr. Dupree's opinion is supported by medically acceptable clinical and laboratory techniques.

Fourth, the ALJ improperly inferred from the gap in treatment that Stokes had improved or was non-compliant with treatment. To receive DIB, a claimant must follow the treatment prescribed by a treating physician unless that claimant has an "acceptable reason." 20 C.F.R. § 416.930(a)-(c). In assessing whether a claimant has an acceptable reason for not following treatment, the ALJ must consider the claimant's "physical, mental, educational, and linguistic limitations." 20 C.F.R. § 416.930(c). The ALJ did not determine whether Stokes had an acceptable reason for the gap in treatment, nor did the ALJ cite evidence why Stokes' gap in treatment "suggested" only improvement or unacceptable non-compliance. (Tr. at 27). Therefore, the ALJ's inference is improper.

I have also considered Plaintiff's argument that, even if Dr. Dupree's opinion was not entitled to controlling weight, the ALJ failed to properly evaluate the appropriate weight given to Dr. Dupree's opinion. In giving the Dr. Dupree's opinion only "some weight" (Tr. at 27), it is claimed that the ALJ did not discuss or consider "[the] treatment relationship, length of treatment

13

relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician." (*See* D.I. 20 at 6); *see also* 20 C.F.R. § 404.1527(d)(2)-(6). At the point where the ALJ made his "some weight" determination, there is explicit discussion of the fifth and sixth factors. The first four factors were discussed in the ALJ's summary of the evidence. (Tr. at 24). Even the specialization of the treating physician was easily inferred from reference to his business as "Harmonious Mind Psychiatric and Counseling Service." (Tr. at 24). Plaintiff says Dr. Dupree is board certified. (D.I. 20 at 6). Plaintiff did not provide a citation to where the record discloses this, and a review of Dr. Dupree's notes do not contain this information. (*See* Tr. at 800-08). Even assuming this evidence is somewhere else in the record, failure to mention it was harmless. Therefore, if the ALJ's determination that Dr. Dupree's opinion was not entitled to controlling weight is, contrary to my opinion, correct, then the ALJ's conclusion as to the weight to be given it would be supported by substantial evidence.

Therefore, because the ALJ improperly discredited Dr. Dupree's opinion, the case warrants reconsideration.

### B. Stokes' Credibility and the Vocational Expert Testimony

Whether the ALJ improperly evaluated Stokes' credibility and whether the VE testimony was flawed need not be addressed. In evaluating the credibility of a claimant's subjective complaints, the ALJ considers the conflicts between the claimant's statements and other evidence, including her medical history, medical symptoms and laboratory findings, and statements by the medical sources. 20 C.F.R. §§ 404.1508, 404.1529(c)(4), 416.908, 416.929(c); *see also Schaudeck v. Comm'r,* 181 F.3d 429, 433 (3d Cir. 1999). A claimant's allegations alone will not establish that she is

14

disabled, and an ALJ need not accept subjective complaints unsupported by the medical evidence. 20 C.F.R. §§ 404.1529(a), 416.929(a). Although the ALJ must seriously consider a claimant's subjective complaints, it is within the ALJ's discretion to weigh such complaints against the medical evidence, and to reject them. *Schaudeck,* 181 F.3d at 433.

In making the disability determination, "a vocational expert ... may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work...." 20 C.F.R. § 404.1560(b)(2). The ALJ may also ask the VE hypothetical questions regarding the claimant ability to perform alternative work. *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir. 1984). "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987) (citing *Podedworny,* 745 F.2d 210; *Wallace v. Secretary,* 722 F.2d 1150 (3d Cir.1983)).

As noted above, the ALJ erred by failing to follow the treating physician rule in assessing Stokes' RFC. Thus, as the case will be remanded, the ALJ will need to assess anew Stokes' credibility and the VE testimony based on a record as it exists at the time.

## IV. CONCLUSION

For the reasons discussed above, the Plaintiff's Motion for Summary Judgment (D.I. 13) is granted; the Commissioner's Motion for Summary Judgment is denied (D.I. 16). The matter will be remanded for proceedings consistent with this opinion.

A separate order will be entered.

15